# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

№ 06-CV-5189 (JFB) (WDW)
_____

## MICHAEL FIERRO AND CHRISTINE FIERRO,

Plaintiffs,

VERSUS

## THOMAS GALLUCCI, FLORENCE GALLUCCI, VILLA POINTE LLC, JAMES NICOTRA, AND ANN MARIE NICOTRA,

Defendants.

_____

**MEMORANDUM AND ORDER**
March 24, 2010

_____

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiffs Michael and Christine Fierro (hereinafter "plaintiffs") brought this action against Thomas and Florence Gallucci (hereinafter the "Gallucci defendants"), Villa Pointe LLC, and James and Ann Marie Nicotra[1] (collectively "defendants"), in connection with the sale of their home to the Gallucci defendants. Plaintiffs contend that the Gallucci defendants made false and misleading statements about their intended use of the property in order to induce plaintiffs to enter into a contract of sale for the property and to induce plaintiffs into consenting to the subsequent assignment of

that contract to Villa Pointe LLC. Specifically, plaintiffs allege claims of fraudulent inducement and unjust enrichment.[2] Presently before the Court are defendants' motion for summary judgment, cross-motions for sanctions, and plaintiffs' appeal of a May 7, 2009 discovery ruling by Magistrate Judge Wall. Defendants also move to dismiss the complaint for lack of subject matter jurisdiction. For the reasons set forth below, the Court concludes the following: (1)

_____

[2] Although plaintiffs' second amended complaint also asserts claims for breach of contract, those claims were dismissed by this Court's Memorandum and Order of May 12, 2008. *Fierro v. Gallucci*, No. 06-CV-5189, 2008 WL 2039545, at *5-6 (E.D.N.Y. May 12, 2008). By letter dated July 7, 2009, plaintiffs clarified that they do not assert claims for breach of contract.

_____

[1] As discussed *infra*, plaintiffs have voluntarily discontinued their action against James and Anne Marie Nicotra (hereinafter "Nicotra defendants").

there is proper subject matter jurisdiction in this case; (2) plaintiffs' appeal of the discovery ruling is denied; (3) defendants' motion for summary judgment is granted; and (4) both parties' motions for sanctions are denied.

## I. BACKGROUND

### A. Facts

The Court has taken the facts set forth below from the parties' depositions, exhibits, and respective Rule 56.1 statement of facts.[3] They are not findings of fact by the Court, but rather are assumed to be true for the purposes of deciding this motion. Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to the non-moving party—here, the plaintiff. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2001). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

### 1. Plaintiffs' Marketing of their Residence

Plaintiff Michael Fierro (hereinafter "Fierro") and his wife Christine Fierro purchased the property at 327 Lakeview Avenue in Rockville Centre, New York (hereinafter "the Residence") in 2001 for $488,000. (Defs.' 56.1 ¶ 5; Pls.' Reply 56.1 ¶ 1.) In 2001, Fierro was admitted to practice law in the State of New York and has worked as an associate at two different law firms.

(Defs.' 56.1 ¶¶ 1, 3-4, 6.) In June 2004, Fierro began working for Prudential Life Insurance Company out of the company's New York office. (Defs.' 56.1 ¶ 7; Pls.' Reply 56.1 ¶ 3; Fierro Dep. at 48.) The new position required plaintiffs to relocate to Georgia in the "near future." (Defs.' 56.1 ¶¶ 7-9.)

Plaintiffs placed the Residence on the market in late May or early June 2004.[4] (Pls.' 56.1 ¶ 1.) Plaintiffs consulted with a real estate agent, who suggested listing the house at $775,000, but plaintiffs marketed the home themselves for between $759,000 and $769,000. (Pls.' 56.1 ¶¶ 3-4.) Plaintiffs marketed the Residence through open houses, advertisements in various periodicals, and by word of mouth. (Pls.' 56.1 ¶ 2.) For instance, plaintiffs placed an advertisement in the New York Times and printed up flyers. (Defs.' 56.1 ¶ 16.)

Neither the newspaper ad nor the flyers indicated that there were any restrictions on the use of the property. (Defs.' 56.1 ¶ 17.) Plaintiffs also did not tell any prospective purchasers that any contract for the sale of the Residence would be contingent on the purchaser's agreeing not to tear the house down or subdivide the property. (Defs.' 56.1 ¶ 26.) Fierro believed that such a restriction would result in a lower value for the Residence. (Defs.' 56.1 ¶ 28.) Fierro would have wanted to place a restriction in use on the Residence, namely that the house could not be torn down, but believed that such a

---

[3] Given the plaintiffs' *pro se* status, the Court has carefully reviewed all of the parties' submissions, including plaintiff Michael Fierro's deposition, to determine if plaintiffs have any evidence to support their claims.

[4] Plaintiffs considered other options besides selling the Residence, including renting the Residence or breaking the Residence into a two-family home, but plaintiffs considered these options only briefly and did not pursue them. (*See* Fierro Dep. at 89-90.)

restriction would have been unenforceable. (Defs.' 56.1 ¶ 30.)

## 2. Pre-Closing Interactions with Defendants

One of the people plaintiffs notified about their marketing efforts in the spring of 2004 was their neighbor, James Nicotra (hereinafter "Nicotra"). (Pls.' 56.1 ¶¶ 6, 9.) Nicotra was a contractor who worked on refinishing houses. (Fierro Dep. at 129; F. Gallucci Dep. at 20.) Nicotra told Fierro that "his buddy Tom [Gallucci] was interested in the property and was going to give [plaintiffs] a call at some point." (Fierro Dep. at 130.)

At some point thereafter, the Gallucci defendants met with plaintiffs at the Residence, bringing their newborn child with them. (Pls.' 56.1 ¶¶ 11-12.) The Gallucci defendants indicated that they were interested in purchasing the Residence and would get back to plaintiffs. (Pls.' 56.1 ¶ 13.) At no point did plaintiffs tell the Gallucci defendants that there was a restriction on the use of the Residence. (Defs.' 56.1 ¶ 27.) Over the next few months, plaintiffs continued to market the Residence. When plaintiffs discussed the status of the process with Nicotra, Nicotra repeatedly told plaintiffs that he hoped that they would sell to his "buddy Tom [Gallucci]." (Pls.' 56.1 ¶ 14; Fierro Dep. at 157-58.)

About two months after their initial meeting, the Gallucci defendants again asked to meet plaintiffs at the Residence. While Florence Gallucci remained in the car, Thomas Gallucci spoke with Fierro on the back deck of the Residence.[5] (Pls.' 56.1 ¶ 15.)

According to plaintiffs, during this conversation, Fierro asked Thomas Gallucci: "So, other than living next door to your friends the Nicotras, why do you want to buy the house?" (Fierro Dep. at 140.) Gallucci responded: "Well, you know, we've got the new baby. My dad lives nearby on Burtis . . . [s]o it would be good to be close to him, it's [got] good schools."[6] (Id. at 140.) Based on this statement, Fierro believed that defendants "intended to essentially occupy the house as a family and . . . not tear it down." (Id. at 210.)

Shortly thereafter, the Gallucci defendants made an offer to purchase the Residence for approximately $710,000, which plaintiffs rejected. (Pls.' 56.1 ¶ 19.) Around the same time, plaintiffs received an offer for the Residence from another party, which, after discussion, the Gallucci defendants topped. (Id. ¶ 21.) Plaintiffs asked both the Gallucci defendants and the other party for their final offer: the other party offered $755,000, and the Gallucci defendants offered $750,000 in cash. (Id. ¶ 22; Defs.' 56.1 ¶ 23.) Plaintiffs accepted the Gallucci defendants' offer and, that night, Fierro spoke on the phone with Thomas Gallucci. (Pls.' 56.1 ¶ 24.) Fierro told Thomas Gallucci that plaintiffs were accepting the Gallucci defendants' bid because of their friendship with the Nicotras and because "they had said they wanted to live near their family and, you know, they

___

[5] Although Thomas Gallucci testified at his deposition that he recalled having a conversation with Fierro on the back deck, he did not recall the specifics of that conversation. (Pls.' 56.1 ¶ 18.)

[6] Although not mentioned in Fierro's deposition testimony, plaintiffs assert in their Rule 56.1 statement that, in addition to the above-discussed conversation about Thomas Gallucci's reasons for wanting to purchase the Residence, Fierro also "espoused the benefits of a local landscaper, to which Mr. Gallucci stated, 'he's hired.' (This conversation was not previously admitted as evidence.)" (Pls.' 56.1 ¶ 17.)

have the new baby. And another part of the reason is that they had represented that they were not going to try and renegotiate the purchase price on the house." (Fierro Dep. at 116, 152.) Fierro also said that "what it boils down to is we just want to give our house a good home." (*Id.* at 153.) Plaintiffs never said to the Gallucci defendants or any prospective purchasers that they were only interested in selling their home "to a family who will maintain the home as a family home." (*Id.* at 166.) Plaintiffs never told prospective purchasers what they could or could not do with the property, but instead asked them "What do you plan to do?" (*Id.* at 168.)

After agreeing to accept the Gallucci defendants' offer, but before signing the contract,[7] plaintiffs received another offer for the Residence from a third party for $800,000. (Pls.' 56.1 ¶ 25.) Plaintiffs rejected this offer. (*Id.* ¶ 26.) Prior to the closing on the sale of the Residence, Fierro spoke with plaintiffs' attorney about the written contract of sale; plaintiffs' attorney had at least some input into the drafting of the contract. (Fierro Dep. at 145, 150, 156; *see also* Defs.' Ex. G.) The parties signed the contract on August 9, 2004. (*See* Pls.' Reply 56.1 ¶ 7; Defs.' Ex. G.) The contract did not include any restrictions on the use of the land.[8] (Defs.' 56.1 ¶ 29; *see also*

Defs.' Ex. G.)

Between the time of contract and closing, there were conversations between the parties' respective attorneys. (Fierro Dep. at 171.) Less than a week before the closing, the Gallucci defendants' attorney told plaintiffs' attorney that defendants wanted to assign the contract to an LLC and that they wanted to renegotiate the purchase price.[9] (*Id.* at 171.) The renegotiation of the purchase price involved a cracked sidewalk in front of the Residence that required repair by the town. (*Id.* at 181.) Plaintiffs were not informed of defendants' reason for wanting to assign the contract. (*Id.* at 172.) Fierro discussed the potential assignment of the contract with his attorney. (*Id.* at 173.)

### 3. The Closing

The closing for the sale of the Residence was held on the evening of September 29, 2004, with the closing for the purchase of plaintiffs' new home in Georgia scheduled for the morning of the next day, September 30, 2004. (Pls.' 56.1 ¶ 27.) Plaintiffs' attorney was present at the New York closing. (Fierro Dep. at 174.) At the closing, "tensions were high." (Pls.' 56.1 ¶ 28.) Fierro testified that words "got a little heated" in connection with the renegotiation of the purchase price. (Fierro Dep. at 182.) At one point, Thomas

---

[7] Also during this time period, plaintiffs renewed their efforts to find a home in Atlanta. (Pls.' 56.1 ¶ 27.) On August 16, 2004, plaintiffs signed a contract to purchase a home in Atlanta for $524,900. (Defs.' 56.1 ¶ 9.) That contract included a provision that plaintiffs' obligation to close on the home in Georgia was contingent on the sale of the Residence in New York. (Defs.' 56.1 ¶ 10; Pls.' Reply 56.1 ¶ 4.)

[8] At some point, the Gallucci defendants performed a title search on the Residence and

confirmed that there were no restrictions on use as part of a common plan of development. (Defs.' 56.1 ¶ 29.)

[9] Villa Pointe LLC was formed some time prior to the closing by Thomas and Florence Gallucci. (T. Gallucci Dep. at 48.) At some point thereafter, other persons joined the LLC, including James and Anne Marie Nicotra and Thomas and Virginia Martello. (T. Gallucci Dep. at 49; F. Gallucci Dep. at 15.)

Gallucci told Fierro: "You're talking trash now." (*Id.* at 207.) At another point, Fierro stood up and "was ready to walkout" but the seating arrangements were such that "there was not enough room to pass." (*Id.* at 207.)

Fierro also asked Thomas Gallucci why defendants wanted to assign the contract of sale to an LLC, to which Thomas Gallucci responded: "Liability." (Fierro Dep. at 174.) Fierro then asked: "So, what are you thinking about doing? Are you going to rent it out?" (*Id.*) Thomas Galluci responded: "Something like that." (*Id.* at 175) Fierro then asked again: "Are you going to live here part of the time and maybe rent it out, or live in your current house part of the time and rent it out part of the time or something?" (*Id.*) Thomas Gallucci replied: "Yeah, something like that." (*Id.*) At this point, Fierro "wasn't sure what exactly was up." (*Id.*) Fierro then turned to Florence Gallucci and asked, "Are you guys going to tear down the house?" and she replied "No."[10] (*Id.*) Fierro testified that there "was some question" in his mind as to whether Florence Gallucci was telling the truth. (*Id.* at 176.)

Plaintiffs assert that they agreed to the renegotiation of the price and to the assignment of the contract[11] because of Florence Gallucci's statement that defendants were not going to tear down the house and because they did not want to disrupt the process with their closing in Georgia the next day. (Fierro Dep. at 208-09.) The Gallucci defendants ultimately paid $748,000 for the Residence. (*See* Pls.' 56.1 ¶ 23.) Plaintiffs closed on their new home in Georgia the next morning. (Fierro Dep. at 184.)

### 4. Defendants' Subdivision and Resale of the Residence

Thomas Gallucci testified that, at the time of the purchase, defendants were considering several options for the Residence, including living there, renting it out, selling it, or having the property re-zoned and knocking down the existing house in place of two houses.[12] (T. Gallucci Dep. at 73.) These options were never communicated to plaintiffs. (*Id.* at 78.) At some point in August 2004, Thomas Gallucci discussed the possibility of developing the property with plaintiffs' neighbor James Nicotra. (*Id.* at 82-84.) At some point Nicotra contacted Core Group Architects to inquire about developing the Residence, and Nicotra received a letter from Core Group Architects, LLP dated August 19, 2004 regarding a proposed re-design of the Residence. (Pls.' 56.1 ¶ 36, 39; Bennet Decl. in Opp. to Pls.' Appeal, July 31, 2009, Ex. B.) Defendants hired a surveyor in September 2004, and by October 15, 2004, the surveyor had completed a detailed schematic of the property completely subdivided into two new homes. (Pls.' 56.1 ¶¶ 41-42.) In or about November 2004, plaintiffs learned that the Residence had been subdivided. (Fierro Dep. at 184.)

---

[10] Florence Gallucci does not recall being asked that question or giving that answer. (F. Gallucci Dep. at 42-43.) Fierro testified that he did not know if anyone else heard this exchange. (Fierro Dep. at 178.)

[11] Plaintiffs argue that Christine Fierro did not consent to the assignment (*see* Pls.' Reply 56.1 ¶ 19) but fail to show how, if at all, this fact affects their claims in the case.

[12] Thomas Gallucci also testified that all of the options were weighed equally at this point and it was "impossible to say" which option carried the most weight. (T. Gallucci Dep. at 85-86.)

## B. Procedural History

Plaintiffs brought this diversity action on September 25, 2006, alleging fraud in the inducement, breach of contract, and unjust enrichment. Plaintiffs filed an amended complaint on January 31, 2007. By Memorandum and Order dated May 12, 2008, the Court granted in part and denied in part defendants' motion to dismiss the complaint. *See Fierro v. Gallucci*, No. 06-CV-5189, 2008 WL 2039545 (E.D.N.Y. May 12, 2008). Specifically, the Court granted defendants' motion to dismiss plaintiffs' breach of contract claims. The Court also granted defendants' motion to dismiss the complaint as to defendants James and Anne Marie Nicotra, but granted plaintiffs leave to re-plead on that issue. Defendants' motion was denied in all other respects.[13] Plaintiffs filed a second amended complaint on June 18, 2008. The Court denied defendants' subsequent motion to dismiss by Memorandum and Order dated December 4, 2008. Defendants answered the second amended complaint on December 15, 2008, and the case proceeded with discovery under the direction of Magistrate Judge Wall.

By letter dated April 8, 2009, defendants requested a pre-motion conference in anticipation of filing a motion for summary judgment and a motion for sanctions. Plaintiffs filed a letter on April 20, 2009, indicating that they also intended to file various motions.[14] At a conference on April 29, 2009, the Court set a briefing schedule on the parties' respective motions. Defendants filed their motion for summary judgment and motion for sanctions on May 11, 2009.[15]

By letter dated May 27, 2009, plaintiffs informed the Court that they wished to appeal a discovery ruling by Magistrate Judge Wall. Plaintiffs had filed a motion to compel certain discovery on April 27, 2009, in which they sought: (1) information regarding defendant Thomas Gallucci's employment; (2) accounting information for Villa Pointe LLC; and (3) information regarding the amount and timing of payments by defendants to Core Group Architects. At a telephone conference on May 7, 2009, Magistrate Judge Wall denied plaintiffs' motion to compel both as untimely and on the merits.

By Order dated May 28, 2009, this Court directed plaintiffs to submit their argument in support of their appeal of Magistrate Judge Wall's ruling in conjunction with their

---

[13] As discussed in the May 12, 2008 Memorandum and Order, the Court applies New York law to plaintiffs' claims. *See Fierro*, 2008 WL 2039545, at *4. Familiarity with that decision is presumed.

[14] In plaintiffs' April 20, 2009 letter, plaintiffs stated that they intended to file their own motion for summary judgment, as well as a motion to join Thomas Martello and Virginia Martello as defendants in this action. Plaintiffs did not file a motion for summary judgment, and by letter dated July 7, 2009, plaintiffs informed the Court that they "have determined not to join the Martellos in this action."

[15] Pursuant to Local Rule 56.2, defendants also served plaintiff with the requisite notice for *pro se* litigants opposing summary judgment motions. *See Irby v. N.Y. City Transit Auth.*, 262 F.3d 412, 414 (2d Cir. 2001) ("And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.").

opposition to defendants' pending motions. On July 7, 2009, plaintiffs submitted their opposition to defendants' motions for summary judgment and sanctions.[16] Plaintiffs also submitted their own motion for sanctions and their appeal of Magistrate Judge Wall's discovery ruling. On July 31, 2009, defendants submitted their replies in support of their motions for summary judgment and sanctions. Defendants also submitted their opposition to plaintiffs' motion for sanctions and to plaintiffs' appeal of Magistrate Judge Wall's discovery ruling. Plaintiffs submitted replies in further support of their motion for sanctions and their appeal on August 17, 2009. This matter is fully submitted.

## II. SUBJECT MATTER JURISDICTION

As a threshold matter, defendants argue in their motion for summary judgment that the Court lacks subject matter jurisdiction to hear this case because, defendants argue, the amount in controversy is less than $75,000. For the reasons set forth below, the Court disagrees and concludes that jurisdiction is proper in this case.

### a. Legal Standard

It is axiomatic that federal courts have diversity jurisdiction only when there is complete diversity between the parties – that is, when all plaintiffs are citizens of different states from all defendants. *See* 28 U.S.C. §

1332; *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 88 (2005); *Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 160 (2d Cir. 1998). In addition, in order for there to be diversity jurisdiction, the amount in controversy must exceed $75,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(a). As the Second Circuit has held:

> A party invoking the jurisdiction of the federal court has the burden of proving that it appears to a reasonable probability that the claim is in excess of the statutory jurisdictional amount. This burden is hardly onerous, however, for we recognize a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy. To overcome the face of the complaint presumption, the party opposing jurisdiction must show to a legal certainty that the amount recoverable does not meet the jurisdictional threshold. Our cases have set a high bar for overcoming this presumption. The legal impossibility of recovery must be so certain as virtually to negative the plaintiff's good faith in asserting the claim.

*Scherer v. The Equitable Life Assurance Soc'y of the U.S.*, 347 F.3d 394, 397 (2d Cir. 2003) (internal citations and quotation marks omitted). Furthermore, "[d]ifferent state claims brought by a single plaintiff may be aggregated for purposes of satisfying the amount-in-controversy requirement." *See Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 221 (2d Cir. 2006).

### b. Application

Defendants argue that the Court lacks

---

[16] In the cover letter accompanying their submission, plaintiffs stated that their claim "is only being pursued against Defendants Thomas Gallucci, Florence Gallucci and Villa Pointe LLC" and that plaintiffs were not pursuing any claims against the Nicotras. (Pls.' Letter to the Court, July 7, 2009, at 2.) Accordingly, any claims against the Nicotras are dismissed.

diversity jurisdiction because plaintiffs cannot satisfy the requisite jurisdictional amount.[17] Specifically, defendants argue that the amount in controversy is less than $75,000 because: (1) even if plaintiffs were successful on their fraudulent inducement claim, they would not be entitled to more than $52,000 as a matter of law; (2) plaintiffs' unjust enrichment claim fails as a matter of law; and (3) plaintiffs are not entitled to punitive damages. For the reasons discussed below, the Court rejects this argument and concludes that diversity jurisdiction in this matter is proper.

First, with respect to plaintiffs' fraud claims, plaintiffs allege that they suffered "actual pecuniary losses by selling for an amount that is less than the market would otherwise have allowed." (Second Am. Compl. ¶ 54.) Plaintiffs allege that they sold the Residence to the Gallucci Defendants for about $748,000 (*id.* ¶ 79), but do not make any allegation with respect to other potential prices. As the Second Circuit has held, "[w]here the damages sought are uncertain, the doubt should be resolved in favor of the plaintiff's pleadings." *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 785 (2d Cir. 1994). Thus, the Court cannot conclude from the face of the complaint that the amount in controversy is less than $75,000. Defendants argue, however, that Fierro testified at his deposition that the highest competing offer at the time was $800,000. Defendants argue, therefore, that plaintiffs' damages cannot exceed $52,000. However, the fact that the highest competing offer at the time was $800,000 does not mean necessarily that plaintiffs could not have sold for a higher price.[18] Because the Court cannot conclude to a legal certainty from the face of the complaint that the damages on plaintiffs' fraud claims would be less than $75,000, subject matter jurisdiction is proper. In any event, as discussed below, plaintiffs' fraud and unjust enrichment claims, when aggregated, satisfy the required jurisdictional amount.

Plaintiffs also seek, on an unjust enrichment theory, disgorgement of defendants' alleged profits, which plaintiffs estimate to be in excess of $1,000,000. (*See* Second Am. Compl. ¶¶ 78-82.) The Court concludes, as discussed *infra*, that plaintiffs' unjust enrichment claim fails as a matter of law. However, as the Second Circuit has held:

> [A]ffirmative defenses asserted on the merits may not be used to whittle down the amount in controversy. Were such defenses to affect the jurisdictional amount, we have said, doubt and

---

[17] The parties do not dispute that there is complete diversity of citizenship between the plaintiffs, who are citizens of Georgia, and defendants, who are citizens of New York.

[18] The damages sought in this case do not involve a sum certain and would depend on a factual determination as to the potential price at which plaintiffs could have sold the Residence. A similar situation arose in *Deutsch v. Hewes St. Realty Corp.*, 359 F.2d 96 (2d Cir. 1966). In *Deutsch*, the plaintiff in a tort action alleged in her complaint that the amount in controversy satisfied the statutory requirement, but subsequent interrogatory responses indicated that the plaintiff had actually suffered far lesser in damages. *Id.* at 97-98. The Second Circuit held that there was federal subject matter jurisdiction: "Though it may seem unlikely that plaintiff will be able to substantiate that she should recover damages in excess of [the requisite jurisdictional amount], on this record it is not clear to a legal certainty that she cannot do so . . . ." *Id.* at 101.

ambiguity would surround the jurisdictional base of most diversity jurisdiction from complaint to final judgment and issues going to a federal court's power to decide would be hopelessly confused with the merits themselves.

*Scherer*, 347 F.3d at 397 (internal quotations and alterations omitted). Thus, when a court dismisses certain claims on a motion for summary judgment, it cannot re-calculate the amount in controversy and then conclude that diversity jurisdiction is lacking. *See Hall v. Earthlink Network, Inc.*, 396 F.3d 500, 507 (2d Cir. 2005) ("In a case like the one before us, where the amount necessary for diversity jurisdiction, *see* 28 U.S.C. § 1332(a), rests on the aggregation of state law claims, a summary judgment dismissing one or more aggregated claims does not defeat jurisdiction even when it reduces the amount in controversy to below the jurisdictional threshold." (citing *Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 63-65 (2d Cir. 1999)). Thus, the Court concludes that the damages requested in connection with plaintiffs' unjust enrichment claim should be counted in determining the amount in controversy.

Finally, plaintiffs seek punitive damages in the amount of $2,600,000. (Second Am. Compl. ¶ 84.) Defendants argue that the requested punitive damages should not be considered in determining the amount in controversy because plaintiffs are not entitled to punitive damages absent any allegation of harm to the public. *See Rocanova v. Equitable Life Assur. Soc. of U.S.*, 634 N.E.2d 940, 944 (N.Y. 1994) (holding that when a plaintiff seeks punitive damages arising from a breach of contract, plaintiff "must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally"); *see also Schonfeld v. Hilliard*, 218 F.3d 164, 184 (2d Cir. 2000) ("The Court of Appeals has since [*Rocanova*] suggested that these requirements are applicable whenever an action 'has its genesis in the contractual relationship between the parties.'" (quoting *New York Univ. v. Continental Ins. Co.*, 662 N.E.2d 763, 767 (N.Y. 1995))); *see also, e.g., Amherst Magnetic Imaging, Assocs. v. Community Blue*, 659 N.Y.S.2d 657, 658 (App. Div. 1997) (affirming dismissal of claim for punitive damages related to fraud where there was no allegation of conduct aimed at the public). In any event, the Court need not decide whether plaintiffs would be entitled to punitive damages on their fraud claim because, as discussed above, plaintiff's other claims, when aggregated, easily satisfy the amount in controversy requirement.

In sum, the Court concludes, based on the face of the complaint, that the amount in controversy is well in excess of the requisite $75,000 jurisdictional amount. Therefore, the Court has subject matter jurisdiction to hear this case.

### III. APPEAL OF DISCOVERY ORDER

At issue on plaintiffs' appeal of the May 7, 2009 discovery ruling are plaintiffs' requests for information regarding accounting for Villa Pointe LLC and the amount and timing of payments to Core Group Architects.[19] Magistrate Judge Wall denied

---

[19] Although plaintiffs also moved to compel discovery on information regarding defendant Thomas Galucci's employment, and initially raised this issue on the instant appeal, plaintiffs have withdrawn this part of their appeal. (*See*

plaintiffs' motion to compel both as untimely and on the merits. For the reasons set forth below, Magistrate Judge Wall's ruling is affirmed.

## A. Standard of Review

Rule 72(a) of the Federal Rules of Civil Procedure states that a district court shall set aside a discovery order of a magistrate judge only when it has been shown that the magistrate's order is "clearly erroneous or contrary to law." *See* Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A). Indeed it is well settled that "[a] magistrate judge's resolution of discovery disputes deserves substantial deference." *Weiss v. La Suisse*, 161 F. Supp. 2d 305, 321 (S.D.N.Y. 2001); *see also Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 124 F.R.D. 75, 77 (S.D.N.Y. 1989) ("[I]n resolving discovery disputes, the Magistrate is afforded broad discretion, which will be overruled only if abused." (quotation omitted)).

## B. Discussion

The Court has carefully reviewed the parties' submissions related to plaintiffs' appeal of the May 7, 2009 discovery ruling, and finds no grounds to disturb that ruling, as set forth more fully below.

---

Pls.' Letter, Aug. 17, 2009, at 1 ("[S]ince the original filing of our Argument in Favor of Appeal of Motion to Compel, the Defendants have provided us with certain requested information, such that at this time we are willing to drop our request for appeal of the denial regarding employment information.").)

### 1. Timeliness of Plaintiffs' Motion to Compel

As a threshold matter, Magistrate Judge Wall did not err by denying plaintiffs' motion to compel as untimely. Magistrate Judge Wall held:

> Discovery closed on April 6, 2009 and this motion was made on April 27th. Plaintiffs have offered no reason to justify their failure to make the motion within the discovery period.

(May 7, 2009 Order, Dkt. 66.) The deadline for the close of discovery had clearly been set as April 6, 2009. (*See* March 9, 2009 Order, Dkt. 56, at 4.) Plaintiffs' motion to compel was filed on April 27, 2009, and was based on allegedly incomplete responses to interrogatories submitted by plaintiffs on March 27, 2009. Plaintiffs offered no explanation for the delay in making their motion. *See* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). Therefore, Magistrate Judge Wall did not err in denying the motion as untimely.[20] *See, e.g.*, *Przygoda*

---

[20] Plaintiffs concede that defendants responded to their interrogatories in a reasonably timely manner. (Pls.' Appeal Br. at 2.) Plaintiffs argue that they did not know that they needed to show good cause for the delay and that they were not permitted to do so at the May 7, 2009 conference, and should be excused for the failure to show good cause as *pro se* parties. In their brief, plaintiffs argue that the delay in submitting the interrogatories was due to an injury sustained by Fierro during depositions in this case. (Pls.' Appeal Br. at 11.) Assuming *arguendo* that plaintiffs could raise this argument for the first time at this stage of the proceedings and that they had successfully shown good cause for the delay, the Court concludes, as discussed *infra*, that

*v. Hove*, No. 98-6007, 1998 WL 743728, at *2 (2d Cir. Oct. 21, 1998) (affirming ruling of district court, which affirmed magistrate judge's ruling that, *inter alia*, "discovery demand was untimely because the deadline for discovery had occurred"); *Millenium Expressions, Inc. v. Chauss Mktg., Ltd.*, No. 02 Civ. 7545, 2003 WL 22853043, at *1 (S.D.N.Y. Nov. 7, 2003) (affirming magistrate judge's ruling striking discovery demands filed two days before the expiration of discovery).

### 2. Merits of Plaintiffs' Motion to Compel

At issue are plaintiffs' requests for "a detailed calculation as to the profits of the LLC" and information on defendants' payments to Core Group Architects.[21] Magistrate Judge Wall held:

> In any event, the court finds that the information sought is not relevant, and the requests do not appear reasonably calculated to lead to the discovery of admissible evidence.

(May 7, 2009 Order, Dkt. 66.) For the reasons discussed below, the Court concludes that Magistrate Judge Wall's ruling was not clearly erroneous or contrary to law[22] and, in any event, the requested information is irrelevant to this Court's disposition of defendants' motion for summary judgment.

Plaintiffs argue that their request for information regarding accounting for Villa Pointe LLC is relevant to the damages on their unjust enrichment claim. (*See* Pls.' Appeal Br. at 6; Pls.' Appeal Reply Br. at 5.) However, the record indicates that plaintiffs have already been provided substantial information on defendants' finances, including, as plaintiffs concede, tax returns for Villa Pointe LLC.[23] (Pls.' Appeal Br. at 6.) In denying a previous motion to compel production of defendants' individual tax returns, Magistrate Judge Wall held that plaintiffs already had the opportunity to obtain an adequate picture of defendants' financial status from other sources, including from defendants' deposition testimony. (*See* March

---

plaintiffs' motion to compel is without merit.

[21] As discussed *supra*, plaintiffs have withdrawn their appeal regarding the request for information about defendant Thomas Gallucci's employment. Even if plaintiffs had not withdrawn this part of their appeal, the Court concludes that Magistrate Judge Wall did not err in holding that the requested information, including a "list of titles of all analyst professionals" in Thomas Gallucci's division at his place of employment (Pls.' Appeal Br., Ex A, at 1), was irrelevant and that plaintiffs' requests were "specious, and [were] made to harass and embarrass defendant." (May 7, 2009 Order, Dkt. 66.)

[22] Even if the Court considered plaintiffs' motion to compel *de novo*, the Court would agree with Magistrate Judge Wall that plaintiffs' motion fails on the merits.

[23] It appears from the record that defendants have also provided plaintiffs with at least one letter authorizing the release to plaintiffs of various records in the possession of defendants' accountants. (*See* Pls.' Appeal Reply Br., Ex. A.) Plaintiffs argue that this kind of production is insufficient and was not given to them until May 18, 2009. (*See* Pls.' Appeal Reply Br. at 6.) Defendants argue that they had already given plaintiffs access to the same records "months earlier." (Defs.' Opp. Appeal Br. at 4.) The Court need not resolve this dispute because, as discussed above, Magistrate Judge Wall's discovery ruling was not clearly erroneous or contrary to law and, in any event, the requested information on damages is irrelevant to this Court's disposition of defendants' motion for summary judgment.

9, 2009 Order, Dkt. 56, at 3.) The fact that plaintiffs might have preferred additional forms of the requested information, in order to reconcile alleged inconsistencies in the evidence (*see* Pls.' Appeal Br. at 6), does not mean that Judge Wall abused his substantial discretion in denying the request. *See* Fed. R. Civ. P. 26(b)(2)(C) ("[T]he court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rules if it determines that . . . the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive . . . [or that] the party seeking discovery has had ample opportunity to obtain the information by discovery in the action."). In any event, the Court concludes, as discussed *infra*, that plaintiffs cannot prove liability on any of their claims, including unjust enrichment, and so any additional evidence on damages is irrelevant.

Plaintiffs argue that their request for information regarding the timing and amount of payments by the defendants to Core Group Architects is relevant to defendants' state of mind. (Pls.' Appeal Br. at 7.) Although such information would be potentially relevant to certain elements of plaintiffs' fraud claims, Magistrate Judge Wall did not err in denying plaintiffs' motion to compel on this issue. The record indicates that defendants had already disclosed to plaintiffs various documents related to defendants' dealings with the architects. (*See* Bennet Decl. in Opp. to Pls.' Appeal, July 31, 2009, Ex. B.) In these circumstances, Magistrate Judge Wall's ruling was not clearly erroneous or contrary to law. *See, e.g.*, *In re Zyprexa Prod. Liability Litig.*, Nos. 04-MD-1956, 08-CV-955, 2009 WL 1310890, at *3 (E.D.N.Y. May 8, 2009) ("If [plaintiff] was dissatisfied with [defendant's] response to its First Set of Requests for Production, it should have sought supplementation from [defendant] (in the form of targeted demands) or relief from this Court at an earlier date." (collecting cases)). In any event, any additional information bearing on defendants' state of mind is irrelevant to this Court's disposition of defendants' motion for summary judgment because, as discussed *infra*, the Court concludes that *plaintiffs* did not reasonably rely on any of the alleged misstatements.

In sum, the Court concludes that Magistrate Judge Wall's May 7, 2009 Order denying plaintiffs' motion to compel was not clearly erroneous or contrary to law under Rule 72 of the Federal Rules of Civil Procedure. Furthermore, the Court notes that none of the requested information would affect this Court's disposition of defendants' motion for summary judgment, and so to the extent plaintiffs now ask this Court to allow additional discovery, such request is denied. *See, e.g.*, *Rafano v. Patchogue-Medford Sch. Dist.*, No. 06-CV-5367, 2009 WL 789440, at *13 (E.D.N.Y. Mar. 20, 2009) ("[T]he contention that the additional discovery would have produced evidence to overcome the summary judgment motion is completely speculative and easily refuted by the other fundamental defects in the federal claims identified in this Memorandum and Order.") (denying purported Rule 56(f) motion seeking additional discovery).

## IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants argue that they are entitled to summary judgment on all of plaintiffs' remaining claims, namely fraudulent inducement and unjust enrichment. For the reasons discussed below, the Court agrees and grants defendants' motion for summary

judgment in its entirety.

## A. Standard of Review

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 104 (2d Cir. 2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (emphasis in original)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

Where the plaintiff is proceeding *pro se*,[24] the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel v. Bd. of Educ. of the City of N.Y.*, 287 F.3d 138, 145-46 (2d Cir. 2002) (alterations in original) (quoting *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000)). Though a *pro se* litigant's pleadings and other submissions are afforded wide latitude, a *pro se* party's conclusory

_____

[24] In this case, the Court gives plaintiffs the deference ordinarily afforded *pro se* litigants. Although Michael Fierro is an attorney, he is not a practicing attorney in the State of New York, *cf. Harbulak v. Suffolk County*, 654 F.2d 194, 198 (2d Cir. 1981) (holding that because plaintiff was a "practicing lawyer," he could not claim "the special consideration which the courts customarily grant to pro se parties"), and, therefore, is properly considered *pro se*. Furthermore, there is no question that plaintiff Christine Fierro is a *pro se* litigant.

assertions, completely unsupported by evidence, are not sufficient to defeat a motion for summary judgment. *Shah v. Kuwait Airways Corp.*, 653 F. Supp. 2d 499, 502 (S.D.N.Y. 2009) ("Even a *pro se* party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.'" (quoting *Auguste v. N.Y. Presbyterian Med. Ctr.*, 593 F. Supp. 2d 659, 663 (S.D.N.Y. 2009))).

## B. Discussion

### 1. Fraudulent Inducement[25]

Plaintiffs allege that they were fraudulently induced by defendants to enter the August 2004 contract of sale and the September 2004 assignment of that contract to Villa Pointe LLC. Both sides agree that there are only two alleged misstatements at issue: (1) the July 2004 conversation on the back deck of the Residence in which Thomas Gallucci allegedly misstated his reasons for wanting to purchase the Residence; and (2) Florence Gallucci's alleged misstatement at the September 2004 closing denying defendants' intention to tear down the house. (*See, e.g.*, Pls.' Summary Judgment Opp. Br. at 10.) Defendants make several arguments in support of their motion for summary judgment, including that plaintiffs could not have reasonably relied on the alleged misstatements. For the reasons discussed below, the Court agrees and concludes that,

based on the undisputed facts and drawing all reasonable inferences in plaintiffs' favor, no rational trier of fact could find that plaintiffs reasonably relied on the statements at issue. Therefore, defendants' motion for summary judgment on plaintiffs' fraud claims is granted.

### a. Legal Standard

In order to state a claim for fraud under New York law, a plaintiff is required to allege the following five elements: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006); *see also Cohen v. Houseconnect Realty Corp.*, 734 N.Y.S.2d 205, 206 (App. Div. 2001). Under New York law, "[e]ach element of a fraud claim must be proven by clear and convincing evidence." *Nader v. ABC Television, Inc.*, 150 F. App'x 54, 57 (2d Cir. 2005) (citation omitted); *see also Laugh Factory, Inc. v. Basciano*, 608 F. Supp. 2d 549, 558 (S.D.N.Y. 2009) ("In proving the elements of fraud, the proponent of the claim must put forth clear and convincing evidence, a standard which applies at the summary judgment stage as well as at trial." (citations omitted)). A failure to satisfy any one element defeats a plaintiff's claim of fraud. *See Shea v. Hambros PLC*, 673 N.Y.S.2d 369, 373 (App. Div. 1998) ("[I]f sufficient factual allegations of even a single element [of fraudulent inducement] are lacking, then the cause of action must be dismissed.") (granting summary judgment on fraud claims where there was no reasonable reliance).

"In assessing the reasonableness of a

---

[25] To the extent plaintiffs also allege fraud or fraudulent misrepresentation, the elements of these claims are the same, particularly with respect to the requirement of reasonable reliance. *See Fax Telecommunicaciones Inc. v. AT&T*, 138 F.3d 479, 490 (2d Cir. 1998) (collecting cases).

plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, LLC*, 343 F.3d 189, 195 (2d Cir. 2003) (citations omitted).

### b. Application

The Court concludes, based on the undisputed facts and drawing all reasonable inferences in plaintiffs' favor, that no rational jury could find that plaintiffs reasonably relied on the two statements at issue as a matter of law.[26] Therefore, defendants' motion for summary judgment on plaintiffs' fraud claims is granted.

### i. July 2004 Conversation on the Back Deck

Plaintiffs allege that defendant Thomas Gallucci's alleged misstatements in July 2004 regarding his reasons for purchasing the Residence induced plaintiffs to enter both the August 2004 contract of sale and the September 2004 assignment of that contract to

---

[26] Because the question of reasonable reliance is dispositive of defendants' motion for summary judgment, the Court need not address whether the other elements of fraud have been met. *See Shea*, 673 N.Y.S.2d at 373 ("[I]f sufficient factual allegations of even a single element [of fraudulent inducement] are lacking, then the cause of action must be dismissed."). Thus, the Court need not consider whether the alleged statements were false or whether there was fraudulent intent by defendants. For purpose of this motion, the Court assumes that the statements were false and that defendants acted with fraudulent intent. The Court also need not address defendants' asserted laches defense.

Villa Pointe LLC. Specifically, plaintiffs allege that at some point in July 2004, during a conversation on the back deck of the Residence, Fierro asked Thomas Gallucci: "other than living next door to your friends the Nicotras, why do you want to buy the house?" Gallucci allegedly responded: "Well, you know, we've got the new baby. My dad lives nearby on Burtis, . . . [s]o it would be good to be close to him, it's [got] good schools."[27] Plaintiffs argue that, because they

---

[27] Plaintiffs argue that, because Fierro included in his question the phrase "other than living next door to your friends the Nicotras," Thomas Gallucci was aware that plaintiffs believed that defendants wanted to live next door to the Nicotras. Plaintiffs argue, therefore, that defendants had a duty to correct that misapprehension and that failing to do so was an implicit statement of defendants' desire to live next door to the Nicotras. (*See* Pls.' Summary Judgment Opp. Br. at 12.) The Court need not decide whether defendants had a duty to correct any such alleged misapprehension because, even if Thomas Gallucci had explicitly told Fierro that one of the reasons he wanted to purchase the Residence was that the Nicotras lived next door, that alleged misstatement would still be too vague and indefinite, as discussed *infra*, to provide a basis for reasonable reliance by plaintiffs.

Plaintiffs also assert in their Rule 56 statement that during the conversation on the back deck, Fierro "espoused the benefits of a local landscaper," and Gallucci said, "he's hired." (Pls.' 56.1 ¶ 17.) As plaintiffs concede, this statement appears nowhere in the record; Fierro did not testify about such a conversation at his deposition. The Court need not consider such an unsworn statement even if submitted by a *pro se* party. *See Salahuddin v. Goord*, 467 F.3d 263, 278 (2d Cir. 2006). In any event, even if the Court did consider this alleged statement as evidence, it is far too vague and indefinite, for the reasons discussed *infra*, to provide grounds for reasonable reliance.

15

wanted to give their house "a good home," they were induced to sell the Residence to defendants. Plaintiffs argue that Thomas Gallucci's statement was false because defendants' true reason for wanting to purchase the Residence was to tear down the house and subdivide the property. (Pls.' Summary Judgment Opp. Br. at 16-17.) For the reasons discussed below, the Court concludes that the alleged misstatement, even if false and made with fraudulent intent, cannot provide a basis for reasonable reliance as a matter of law.

A party cannot reasonably rely on a vague and indefinite statement of opinion as an inducement to agree to a contract.[28]  In *George Backer Management Corp. v. Acme Quilting Co.*, 385 N.E.2d 1062 (N.Y. 1978), the New York Court of Appeals held that an alleged misstatement of opinion that the expected future payments on a contract would be four or five percent of a certain rate

> sets forth no reasonable ground for reliance.  The very indefiniteness of the figures confirms this statement as an

expression of opinion rather than fact. Above all, it did not relate to a concrete fact or existing event.  At best, it was no more than an expression of expectations as to labor agreements which had yet been negotiated and the outcome of which, as both parties knew, could not be foretold.  As a matter of law, then, it cannot form the basis for a claim of misrepresentation.

*Id.* at 1067 (citation omitted).  As the Second Circuit has further explained:

> The distinction depends upon how far the utterance implicitly presupposes the use of some subjective standard by the utterer.  Value, quality, fitness, success, are usually understood as meaning no more than that the objects conform with the defendant's individual yardstick in such matters.  While he may make it clear that his reference is to some commonly accepted measure, ordinarily he does not, and his hearer takes it for more at his peril.

*Stern v. Satra Corp.*, 539 F.2d 1305, 1308 (2d Cir. 1976) (quoting *Taylor v. Burr Printing Co.*, 26 F.2d 331, 334 (2d Cir. 1928), *cert. denied*, 278 U.S. 641 (1928)).  Thus, numerous courts have held that there was no reasonable reliance as a matter of law where the misstatement at issue was an indefinite prediction of future events.  *See, e.g.*, *Adrien v. Estate of Peter Zurita*, 814 N.Y.S.2d 709, 710 (App. Div. 2006) ("[Defendant's] alleged oral representations regarding the future outcome of the [tenant] holdover proceeding were mere expressions of opinion of present or future expectations, upon which the plaintiff could not justifiably rely.") (granting summary judgment); *Goldman v. Strough Real Estate, Inc.*, 770 N.Y.S.2d 94, 95 (App.

---

[28] The Court recognizes that some statements of opinion can be actionable as fraud.  *See CPC Int'l Inc. v. McKesson Corp.*, 514 N.E.2d 116, 125 (N.Y. 1987) (holding that financial projections were "material existing fact[s], sufficient to support a fraud action") (collecting cases); *see also Magnaleasing, Inc. v. Staten Island Mall*, 428 F. Supp. 1039, 1042 (S.D.N.Y. 1977) ("It has long been the law of New York that an expression of opinion may constitute actionable fraud.  A statement of a man's opinion, estimate or prediction is a representation of his state of mind and, like his intent, is 'as much a fact as the state of his digestion.'") (collecting cases)).  However, as discussed above, some expressions of opinion are too vague and indefinite to provide a basis for reasonable reliance.

Div. 2003) (affirming summary judgment for defendants and finding that plaintiffs could not justifiably rely on alleged misstatement by real estate broker that adjacent property owner would not develop in a way that obstructed plaintiffs' southerly view); *Koagel v. Ryan Homes, Inc.*, 562 N.Y.S.2d 312, 314 (App. Div. 1990) ("Defendants' projection of plaintiffs' future tax liability was merely an estimate and could only reasonably have been understood as such, given the volatility of tax rates and assessments.") (granting summary judgment).

Furthermore, vaguely expressed opinions cannot provide grounds for reasonable reliance. *See, e.g.*, *Int'l Oil Field Supply Servs. Corp. v. Fadeyi*, 825 N.Y.S.2d 730, 734 (App. Div. 2006) ("Vague expressions of hope and future expectation provide an insufficient basis upon which to predicate a claim of fraud.") (finding no reasonable reliance); *Van Kleeck v. Hammond*, 811 N.Y.S.2d 452, 454-55 (App. Div. 2006) (holding that there was no reasonable reliance where defendant Board members made "vague" and "indefinite" assurances to plaintiff that they would make him a part-time police chief); *FMC Corp. v. Fleet Bank*, 641 N.Y.S.2d 25, 26 (App. Div. 1996) (finding no reasonable reliance on defendant's vague statements that a particular client's account was "satisfactory," that defendant was "comfortable" with the client, and that defendant "regarded its credit relationship with [the client] as long term").

Thomas Gallucci's statement about his motivation for purchasing the Residence falls squarely in the category of vague and indefinite statements of opinion upon which the listener may not reasonably rely. As a threshold matter, Thomas Gallucci did not expressly state any concrete present intentions regarding defendants' future use of the Residence.[29] *See, e.g.*, *Nader v. ABC Television, Inc.*, 330 F. Supp. 2d 345, 349 (S.D.N.Y. 2004), *aff'd*, 150 F. App'x 54 (2d Cir. 2005) (granting summary judgment on fraudulent inducement claim where "[plaintiff] cannot point to a single statement in which [defendant] definitively promised him it would actually rehire him," there was no showing of reliance (reasonable or otherwise), and the alleged misstatements were instead merely "speculation and expressions of hope for the future"). Instead, he vaguely stated his reasons for wanting to purchase the Residence – that defendants had a new baby, the neighborhood had good schools, Thomas Galluci's father lived nearby, and that the Nicotras lived next door.[30]

_____

[29] In this way, the alleged misstatement was of a different character from Florence Gallucci's alleged statement at the September 2004 closing denying an intention to tear down the house. A statement expressing a clear present intention as to the future use of land can in some cases be actionable as fraud. *See Adams v. Gillig*, 199 N.Y. 314 (1910). However, as discussed *infra*, even if Florence Gallucci's statement of intention would otherwise be actionable, the Court concludes that no rational jury could find that there was reasonable reliance on that statement in this case.

[30] Some courts have found that similar statements of opinion are not representations of fact and, therefore, cannot serve as the basis for fraud claims. *See, e.g.*, *Glazer v. LoPreste*, 717 N.Y.S.2d 256, 258 (App. Div. 2000) (holding that sellers' alleged misrepresentations that the house was a good place to raise children were "no more than expressions of opinion which cannot sustain a cause of action alleging fraud"); *Paladino v. Adelphi Univ.*, 454 N.Y.S.2d 868, 874 (App. Div. 1982) ("Those claims concerning misrepresentations as to the quality or comparative quality of the education to be provided . . . are not

Even if Thomas Gallucci were misrepresenting his reasons for purchasing the Residence, it was unreasonable for plaintiffs to rely on this statement as an inducement to sell the Residence to defendants. A recent decision from the Appellate Division, Third Department is directly on point. *See M&R Ginsburg, LLC v. Orange Canyon Dev. Co.*, 893 N.Y.S.2d 369, 371 (App. Div. 2010). In *M&R Ginsburg*, plaintiff owned a piece of property that was governed by a restrictive covenant prohibiting the use of the property for a pharmacy. *Id.* at 370. Plaintiff knew that this restriction had frustrated prior negotiations for the sale of the property in question, but nevertheless sold the property to defendants without any pharmacy restriction in the contract. *Id.* Thereafter, plaintiff learned that defendants had all along intended to develop the property as a Walgreens pharmacy. *Id.* Plaintiff brought suit, alleging fraud because defendants had been aware of the pharmacy restriction at the time of the contract, but had concealed their association with Walgreens and had made misrepresentations as to their intended use of the property. *Id.* The Appellate Division affirmed summary judgment for the defendants, holding that there was no reasonable reliance by plaintiff. With respect to the alleged misstatements, the court held:

> The relevant representations are a statement made by the developers' broker to plaintiff's broker that the developers were working with different retailers and did not have a specific use in mind, and an e-mail message in which the developers' counsel said that the developers were about to "pitch" the parcel and other sites to prospective tenants. These vague and noncommital statements could have led plaintiff to believe that a tenant had not yet been found, but not to conclude that no pharmacy would be developed and, therefore, no further use restriction was necessary.

*Id.* at 371. Therefore, the court held that "plaintiff failed to establish the crucial element of justifiable reliance for its fraud and rescission claims." *Id.* Similarly, in the instant case, where plaintiffs did not inform defendants of any restriction on the future use of the property (*see, e.g.*, Fierro Dep. at 166, 168),[31] plaintiffs could not reasonably rely on

---

statements of fact capable of proof, but rather opinions which ought not provide a basis for the imposition of liability."). Plaintiffs argue that defendants' statements are of a different character because plaintiffs allege not that defendants misrepresented the quality of the schools or neighborhood, but rather that defendants misrepresented their actual reasons for purchasing the Residence. The Court need not decide this issue because, as discussed above, even if Thomas Gallucci's alleged misstatements were statements of fact, they were too vague and indefinite to provide grounds for reasonable reliance.

---

[31] Although plaintiffs argue that Fierro told Thomas Gallucci that plaintiffs had decided to sell to defendants because plaintiffs wanted to give their house "a good home," that conversation took place after Thomas Gallucci's statement on the back deck (Fierro Dep. at 153) and, in any event, is, as plaintiffs concede "open to interpretation." (Pls.' Summary Judgment Opp. Br. at 12.) Plaintiffs argue that defendants were obligated to correct plaintiffs' "misapprehension" and affirmatively declare that their true intention was to develop and re-sell the property. The Court rejects this argument and, to the extent plaintiffs assert a claim of fraudulent concealment, concludes that such a claim fails as a matter of law. A party to a transaction has a duty to disclose only when there is a fiduciary relationship or where the party has superior knowledge, not readily available to the other, and knows that the

Thomas Gallucci's "vague and noncommital" statement as to his reasons for purchasing the Residence. Specifically, plaintiffs might reasonably have believed that defendants liked the neighborhood, but plaintiffs could not reasonably rely on this statement as an inducement to sell the Residence on the assumption that defendants would not develop and/or re-sell the property.

---

other is acting on the basis of mistaken knowledge. *See Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 123 (2d Cir. 1984). There is no dispute that defendants had no fiduciary duty to plaintiffs. Plaintiffs argue, however, that defendants had superior knowledge because only defendants knew defendants' true intent, and therefore had a duty to correct plaintiffs' apparent misapprehension. However, reasonable reliance is also a required element of a fraudulent concealment claim under New York law. *See, e.g.*, *Highland Capital Mgmt., L.P. v. Schneider*, 533 F. Supp. 2d 345, 357 (S.D.N.Y. 2008). Thus, New York courts impose a duty to speak only where "plaintiff's reliance on defendant induced it to enter certain unfair transactions." *Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.*, 601 F. Supp. 770, 774 (S.D.N.Y. 1985) (collecting cases). The Court concludes that, as a matter of law, plaintiffs cannot show that they reasonably relied on any failure of Thomas Gallucci to independently disclose defendants' intended future use of the property. Specifically, Fierro could not reasonably rely on any such failure by defendants as an inducement to sell the Residence merely because defendants were aware that plaintiffs wanted to give the house a "good home." *See, e.g.*, *M&R Ginsburg*, 893 N.Y.S.2d at 370-71 (finding no reasonable reliance for fraud claim even where defendants were aware of the relevant restrictive covenant and did not disclose to plaintiff their intended use of the property). As discussed above, Fierro's statement that plaintiffs wanted to give the house a "good home" was far too vague and "open to interpretation" to give rise to a duty to speak on defendants' part.

Plaintiffs argue that they were entitled to rely on Thomas Gallucci's statement because nothing about the statement raised "red flags" such that further investigation was necessary and that, in any event, no such investigation of defendants' subjective intent was possible. (*See* Pls.' Summary Judgment Opp. Br. at 14-15, 17.) As discussed above, Thomas Gallucci's statement was too vague and indefinite to provide a basis for reasonable reliance even absent any "red flags" about the statement's veracity. Furthermore, the fact that plaintiffs could not investigate Thomas Gallucci's subjective intent does not entitle plaintiffs to rely on the alleged misstatement, which made no explicit statement of present intention regarding defendants' future use of the Residence. Instead, the statement was vague and was obviously based on Thomas Gallucci's own subjective standards about the desirability of good schools or proximity to his father and friends.[32] The fact that plaintiffs had no way of knowing Thomas Gallucci's actual subjective views about the

---

[32] With respect to such statements of prediction, New York courts have stated:

> Mere predictions, however, may not form the basis for an action for fraud when both parties have equal access to the facts, *or when it is obvious that the declarant is using a subjective standard*. In these situations, reliance on the opinions is deemed unreasonable. However, where one party does have superior knowledge, the expression of an opinion implies that the declarant knows facts which support that opinion and that he knows nothing which contradicts the statement.

*West Side Federal Sav. & Loan Ass'n v. Hirschfeld*, 476 N.Y.S.2d 292, 295 (App. Div. 1984) (quotation omitted) (emphasis added).

desirability of purchasing the Residence does not mean that plaintiffs were entitled to rely on the statement. To hold otherwise would mean that every statement of opinion would in all cases provide a ground for reasonable reliance because a party could never be certain of whether the speaker actually held the asserted opinion. That is not the law; rather, as discussed above, when a statement of opinion is vague and indefinite, it does not provide a ground for reasonable reliance as a matter of law.[33]

Finally, plaintiffs argue that the issue of reasonable reliance is a question of fact that is inappropriate for resolution on summary judgment. The Court recognizes that "the question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive," *Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 98 (2d Cir. 1997). However, some alleged misstatements provide no grounds for reasonable reliance as a matter of law. *See id.* at 101 (affirming post-trial entry of judgment as a matter of law for defendants); *J.A.O. Acquisition Corp. v. Stavitsky*, 795 N.Y.S.2d 569, 571 (App. Div. 2005) ("While this Court has recently held that the issue of reasonable reliance is not subject to summary disposition,

these facts present the rare circumstance in which it should be."). For instance, numerous appellate courts in New York have upheld summary judgment on the issue of reasonable reliance where the statement at issue was one of vague or indefinite opinion. *See, e.g.*, *M&R Ginsburg*, 893 N.Y.S.2d at 371 (granting summary judgment on issue of reasonable reliance); *Adrien*, 814 N.Y.S.2d at 710 (same); *Kleeck*, 811 N.Y.S.2d at 454-55 (same); *Goldman*, 770 N.Y.S.2d at 95 (same); *Koagel*, 562 N.Y.S.2d at 314 (same).

In sum, the Court concludes as a matter of law that Thomas Gallucci's statement about his reasons for purchasing the Residence was too vague and indefinite to provide a basis for reasonable reliance.[34] Thus, no rational jury could find that plaintiffs were fraudulently induced by this statement to enter either the August 2004 contract of sale or, as discussed *infra*, the September 2004 assignment of that contract. Accordingly, defendants' motion for summary judgment as it relates to any claims of fraudulent inducement based on that statement is granted.

### ii. September 2004 Statement at the Closing

Plaintiffs also allege that they were fraudulently induced to agree to the September 2004 assignment of the contract to Villa Pointe LLC by Florence Gallucci's statement at the closing on September 29, 2004. Plaintiffs allege that, at the closing,

---

[33] Plaintiffs cite to cases with broad language stating that courts cannot find reasonable reliance where a party did not have access to the same facts as defendant. (*See* Pls.' Summary Judgment Opp. Br. at 14.) For instance, in *E*Trade Fin. Corp. v. Deutsche Bank AG*, 420 F. Supp. 2d 273, 288 (S.D.N.Y. 2006), the court held that, in connection with reliance on a party's documentation for a business transaction, "[t]he only time a party's reliance is not 'reasonable' is if it 'has been put on notice of the existence of material facts which have not been documented." However, the cases cited by plaintiffs do not involve the question of whether a party is entitled to rely on a vague and indefinite statement of opinion.

[34] To the extent defendants argue that plaintiffs could not reasonably rely on any alleged misstatement because of the general merger clause in the contract of sale, the Court rejects that argument for the reasons it was rejected in the Court's Memorandum and Order of May 12, 2008. *Fierro*, 2008 WL 2039545, at *12-15.

Fierro asked Florence Gallucci: "Are you guys going to tear the house down?" to which Florence Gallucci allegedly responded, "no." For the reasons discussed below, the Court concludes that, even if the alleged misstatement were false and made with fraudulent intent, no rational jury could find, based on the undisputed facts and drawing all reasonable inferences in plaintiffs' favor, that plaintiffs reasonably relied on Florence Gallucci's statement.

A misstatement of intent regarding the future use of land can in some circumstances be actionable as fraud. *See Fierro*, 2008 WL 2039545, at *7-10; *see also Adams v. Gillig*, 199 N.Y. 314 (1910). However, even where an alleged misstatement of fact would otherwise be actionable, the circumstances surrounding that statement may make any reliance on the statement unreasonable as a matter of law. As the Second Circuit has held,

> [c]ircumstances may be so suspicious as to suggest to a reasonably prudent plaintiff that the defendants' representations may be false, and that the plaintiff cannot reasonably rely on those representations, but rather must make additional inquiry to determine their accuracy.

*Schlaifer*, 119 F.3d at 98 (2d Cir. 1997) (quotation omitted); *see also Sanitoy, Inc. v. Shapiro*, 705 F. Supp. 152, 158 (S.D.N.Y. 1989) ("Whether a plaintiff may justifiably rely on a representation depends on whether the plaintiff 'was placed on guard or practically faced with the facts.'" (quoting *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 81 (2d Cir. 1980))).

In this case, based on the undisputed facts,

plaintiffs could not reasonably rely on defendants' alleged misstatements at the time of the closing. It is undisputed that "tensions were high" at the closing (Pls.' 56.1 ¶ 28), and that "words got a little heated" (Fierro Dep. at 182). For instance, in connection with the renegotiation of the purchase price, Thomas Gallucci told Fierro: "You're talking trash now." (Fierro Dep. at 207.) At one point, Fierro got up to "walk out," but there was not room to do so. (*Id.*) It was in this context that Fierro asked Thomas Gallucci why defendants wanted to assign the contract, to which Gallucci replied "liability" and, when asked whether defendants were going to rent out the Residence, Gallucci replied "something like that."[35] (Fierro Dep. at 174-75.) These circumstances made it unreasonable for plaintiffs to believe that defendants intended to live in the Residence and not develop or re-sell the property. Although Florence Gallucci then denied any intention of tearing down the house, plaintiffs could not reasonably rely on that statement as a matter of law based on the above-discussed circumstances.

The Appellate Division, First Department dealt with a similar situation in *Shea v. Hambros*, 673 N.Y.S.2d 369 (App. Div. 1998). In that case, plaintiff and defendants were members of a business organization, and defendants represented to plaintiff that they wanted to expand the business through a reorganization. Plaintiff consented to various reorganization agreements, and thereafter

---

[35] To the extent plaintiffs argue that Thomas Gallucci's "something like that" statement was itself a fraudulent misstatement, the Court disagrees. For the reasons discussed *supra* in connection with Thomas Gallucci's statement on the back deck of the Residence, such a statement is too vague and indefinite to provide a basis for reasonable reliance.

plaintiff was ousted from the business. Plaintiff alleged that despite defendants' stated purpose for the reorganization, "[defendants'] actual undisclosed intent behind the reorganization was to oust" plaintiff from the business. *Id.* at 373. The Appellate Division held that the required element of reliance was "conspicuously absent" on plaintiff's fraud claims. Indeed, "[g]iven what [plaintiff] concedes was the sharply 'acrimonious' nature of the negotiations, to the degree that they were 'almost broken off,' and the dissension among the parties, he can hardly claim with any credibility that he, a savvy businessman, entered into the resulting agreements lulled by faith or trust in the parties across the bargaining table, or that he unwittingly gave up some valued right in the bargain." *Id.* at 374. Furthermore, the lack of reasonable reliance defeated plaintiff's claim despite "defendants' alleged failure to disclose their true intent in pursuing the reorganization agreements." *Id.* Similarly, in *Caron v. The Travelers Property and Casualty Corp.*, 71 F. Supp. 2d 269, 277 (S.D.N.Y. 1999), the court held that there was no reasonable reliance on defendant's alleged statements regarding plaintiff's future employment where plaintiff, "a sophisticated, experienced attorney who had held numerous jobs in different business settings over his forty-plus year career, . . . should have known that plans could change." *Id.* (granting post-trial judgment for defendants as a matter of law). The court further held, "[e]ven assuming that he actually believed that corporate approval had been given for the project, it was not reasonable for him to believe that [defendant] was making any commitment that could not be changed." *Id.*

In the instant case, where tensions at the closing were high, plaintiffs' attorney was present, and Fierro himself was an attorney, it was unreasonable to "be lulled by faith or trust in the parties across the bargaining table." *Shea*, 673 N.Y.S.2d at 374. Furthermore, Fierro, who had briefly spoken with plaintiffs' attorney about the subject and was an attorney himself,[36] believed that any contractual restriction on the use of the property would not necessarily be enforceable. (*See* Fierro Dep. at 161-62.) For example, Fierro testified:

> Q. And concerning your – the sale of your house, whether it be to the Galluccis or the gentleman from JP Morgan or the lady from Plandome Manor, did you intend to put restrictions on what usage they could put the house to?
>
> A. Well, we would have liked to, but as you know, real estate law would not necessarily find that enforceable.
>
> Q. Okay. What restrictions would you have liked to put on?
>
> A. That they can't tear down the house.

(Fierro Dep. at 161-62.) Fierro testified further:

> Q. I'm assuming it was your belief that this [restriction on the property] was something you would have liked to

---

[36] To the extent plaintiffs argue that the Court should draw some distinction as to the sophistication of Michael Fierro and Christine Fierro, the Court rejects that argument. Plaintiffs' case is based on alleged misstatements that only Michael Fierro witnessed. Christine Fierro did not hear either alleged misstatement. (Christine Fierro Dep. at 219-20.)

have – a goal you would have liked to have accomplished –

A. Yes.

Q. – but perhaps a goal that in your mind you could not legally accomplish; am I correct?

A. To an extent. I mean, if you're familiar with the Adams v. Gillig case, for example, you know, essentially what they're saying is – and even though I was not familiar with it at the time, you know, the concept makes sense. That, you know, even though you can't put a covenant on it, what you can do is just, what do you plan to do now? And so it's the difference between representations and warranties and covenants. And we asked them what they planned to do with the house. And that's why we asked them. It's not kind of a common thing to ask somebody why do you want to buy my house, but we asked specifically with these kinds of thoughts in mind.

(Fierro Dep. at 164-65.) In light of the above-discussed circumstances and because Fierro believed that a contractual restriction on the future use of the land was unenforceable, and furthermore because Fierro recognized that he was only asking defendants about what they "plann[ed] to do now" (Fierro Dep. at 165), it was unreasonable for plaintiffs to rely on Florence Gallucci's statement as an inducement to agree to the assignment of the contract.

Not only did the circumstances indicate that there was reason to question defendants' veracity on this issue, it is undisputed that plaintiffs did, in fact, question the veracity of Florence's Gallucci's alleged statement.[37] At his deposition, Fierro testified:

Q. When Florence said "No" to you, were there doubts in your mind as to whether or not she was telling you the truth?

A. I kind of wondered. Yeah, I mean, there was some question.

Q. And was part of that predicated on the fact that they were talking about putting title into an LLC?

A. Yeah.

Q. Okay. Apart from the existence of the LLC, was there anything else that had come up in your mind as to what Florence was saying to you?

A. Do you mean why I asked her if they were going to tear down the house or –

Q. No. I think a moment ago, when I had asked you, you know, if you thought Florence was telling you the truth, and you seemed to have some hesitancy, you seemed to be saying no –

A. Right.

---

[37] Whether plaintiffs actually believed Florence Gallucci's statement is a disputed question of fact. (*See, e.g.*, Pls.' Sanctions Br., Ex. A, at 6 ("Counsel specifically did not ask whether or not Mr. Fierro believed [Florence Gallucci], and the answer to that question is yes.").) However, as discussed above, it is undisputed that there was "some 'question' as to her veracity." (*Id.*) For purposes of this motion, the Court assumes that Fierro actually believed Florence Gallucci's statement.

Q. – but I guess what I'm asking is apart from the fact that it was going to be titled in the LLC, was there something else that caused you to doubt what Florence was telling you?

A. Well, the fact that Tom was having a little bit of trouble giving kind of a more straight answer than saying, "Something like that."

(Fierro Dep. at 176-77.)[38]  Where a party has reason to know that a statement is false, there can be no reasonable reliance as a matter of law.  *See Banque Franco-Hellenique de Commerce Interne. et Maritime, S.A. v. Christophides*, 106 F.3d 22, 27 (2d Cir. 1997) ("[Plaintiff] could not have justifiably relied on statements that he had reason to know were false."); *Massaro v. Detroit Diesel Corp.*, 1996 WL 738844, at *3 (2d Cir. Dec. 26, 1996) ("When a party suspects an ongoing pattern of fraud, it cannot be reasonable for that party, in reliance on alleged oral statements of the suspected wrongdoer, to enter a contract containing a clause that clearly states that the written agreements contain the entire agreement."); *see also J.A.O.*, 795 N.Y.S.2d at 571 (granting summary judgment and holding that there was no reasonable reliance where, in connection with the sale of a business, plaintiff was aware prior to the closing that defendants' representations were false).

Therefore, although the Court assumes for purpose of this motion that plaintiffs did in fact believe Florence Gallucci's statement, plaintiffs could not, as a matter of law, reasonably rely on that statement.[39]  *See, e.g.*, *Schlaifer*, 119 F.3d at 101 (holding that the evidence at trial showed that the circumstances raised doubts as to the veracity of defendant's alleged statements and that "these questions, as a matter of law, illustrate that it was unreasonable for [plaintiff] to rely on the [defendant's] representations . . . ."); *Van Kleeck*, 811 N.Y.S.2d at 454-55 (holding that there was no reasonable reliance on alleged misstatement by defendant Board members that they would make plaintiff a part-time police chief where the assurances were "vague" and "indefinite" and where "at least one Board member expressed her opinion that she did not intend to abolish the full-time chief position"); *Shea*, 673 N.Y.S.2d at 374; *Sanitoy*, 705 F. Supp. at 157 ("These later representations are insufficient to 'revive' the claim for damages . . . because

---

[38] Plaintiffs' interrogatory responses also indicate that plaintiffs were aware before the closing of the possibility that defendants might tear down the house.  (*See* Defs.' Sanctions Reply Br., Ex. C, Pls.' Response to Interrogatories, Mar. 9, 2009, ¶ 6 ("Sometime after purchasers expressed their intent to assign the purchase agreement to an LLC but before the closing, we began to consider why the defendants would want to assign the rights to an LLC.  One alternative that occurred to us is that they were going to tear the house down.").)

[39] Plaintiffs argue that, even if there were red flags regarding the veracity of Florence Gallucci's statement, they were nonetheless entitled to rely on the statement because they had no way of investigating the truth of her subjective intention.  The Court rejects that argument for the same reason it was rejected in connection with Thomas Gallucci's alleged misstatement.  Furthermore, even if plaintiffs could not determine the truth of defendants' subjective statements, they could have tried to include an appropriate restriction in the contract.  *See Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1543 (2d Cir. 1997) (holding that there was no reasonable reliance where sophisticated plaintiff could have inserted appropriate language into the contract to protect itself from any misrepresentations).  The fact that such a restriction may have been unenforceable is a matter of speculation.

plaintiffs had already discovered that they could not believe defendants' representations about the quality of the goods. Even if these repeated assurances were actionable as opposed to mere puffery, plaintiffs could not reasonably have relied on them as truthful."); *Sylvester v. Bernstein*, 127 N.Y.S.2d 746, 750 (App. Div. 1954) ("Assuming that landlord did not know at the time she made the lease with tenants that the occupancy was to be exclusively residential, the judgment in the City Court involved a finding that she either acquired that knowledge or that she should have known the facts for at least the year for which excess rent was recovered.") (holding that there was no reasonable reliance).

Because plaintiffs did not reasonably rely on Florence Gallucci's alleged misstatement, no rational jury could find that plaintiffs were fraudulently induced to enter the contract of assignment.[40] Plaintiffs, however, argue that "any 'red flags' which might have arisen at closing may go against Plaintiffs' claims that they were induced to agree to the assignment contract, but *they do not undo Plaintiffs' already actionable claim for fraud* [based on Thomas Gallucci's statement on the back deck]." (Pls.' Summary Judgment Opp. Br. at

---

[40] To the extent plaintiffs argue that they were obligated to agree to the contract of assignment based on the August 2004 contract of sale (*see* Pls.' Summary Judgment Opp. Br. at 6), the Court disagrees. It is undisputed that the August 2004 contract provided: "This contract may not be assigned by Purchaser without the prior written consent of Seller in each instance and any purported assignment(s) made without such consent shall be void." (Defs.' Ex. L, "Residential Contract of Sale," ¶ 26.) Thus, even assuming *arguendo* that plaintiffs were fraudulently induced to enter the original contract, they were still under no obligation to agree to the subsequent assignment of that contract.

16 (emphasis in original)). In other words, plaintiffs argue that, once they had been fraudulently induced to enter the August 2004 contract, they had no choice but to proceed with the allegedly fraudulently induced sale of the Residence. The Court rejects this argument. As discussed above, the Court has already concluded that plaintiffs were not fraudulently induced to enter the August 2004 contract because plaintiffs could not, as a matter of law, reasonably rely on Thomas Gallucci's alleged misstatement.[41] Therefore,

---

[41] The Court notes that because plaintiffs were not fraudulently induced to enter the August 2004 contract of sale, plaintiffs were still bound by that contract even if they believed Florence Gallucci was lying to them at the closing. As the Second Circuit has held, absent fraudulent inducement, a party cannot defend against a breach of contract claim on the grounds that the party subsequently learns of the other side's bad faith. *See Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1544 n.2 (2d Cir. 1997) ("[Defendant] claims that its failure to negotiate was justified by the fact that it had learned of [plaintiff's] fraud in the inducement. [Defendant] suggests that, even if its reliance was unjustifiable as a matter of law, such that it could not establish fraud, it still was justified in failing to negotiate in good faith, since [plaintiff] had behaved in bad faith in making the initial misrepresentations. But allowing this claim would undermine the legal principle that a party cannot avoid the effects of a contract on fraud grounds unless its reliance was justifiable. [Defendant's] argument on this score is an impermissible attempt to do an end run around the elements of a New York claim of fraud."). Furthermore, even if plaintiffs had actually been fraudulently induced to agree to the assignment, that would not make the August 2004 contract of sale invalid and, therefore, plaintiffs would still have been contractually obligated to sell the Residence. *See, e.g.*, *Bank Leumi Trust Co. of N.Y. v. D'Evori Int'l, Inc.*, 558 N.Y.S.2d 909, 916 (App. Div. 1990) ("A party, however, cannot be defrauded into doing that which it was already

all of plaintiffs' fraud claims must fail because plaintiffs did not reasonably rely on any alleged misstatement.[42]

---

legally obligated to do." (citation omitted)). Therefore, even if plaintiffs had reasonably relied on Florence Gallucci's statement and were thus fraudulently indued to enter the contract of assignment, their fraud claim would be based only on any losses incurred as a result of that assignment and not on any losses incurred as a result of the sale of the Residence. Because plaintiffs had already agreed to sell the Residence for less than they allegedly could have done otherwise, it is entirely unclear what, if any, damages plaintiffs could obtain on a claim related solely to the contract of assignment.

[42] For all of the above-discussed reasons, the instant case is distinguishable from *Adams v. Gillig*, 199 N.Y. 314 (1910). In *Gillig*, the defendant falsely stated to a seller of land that he intended to live on the property, when he actually intended to build a public automobile garage. 199 N.Y. at 314. The Court of Appeals held that "the false statements made by the defendant of his intention should under the circumstances of this case be deemed to be a statement of a material, existing fact of which the court will lay hold for the purpose of defeating the wrong that would otherwise be consummated thereby." *Id.* at 332. As discussed in this Court's May 12, 2008 Memorandum and Order, *Gillig* undermined defendants' argument at the motion to dismiss stage that an alleged misrepresentation regarding an intention for the future use of land could *never* form the basis of a fraudulent inducement claim. *See Fierro*, 2008 WL 2039545, at *7-10. However, the *Gillig* Court did not explicitly address whether the plaintiff's reliance on defendant's stated intention regarding the property was reasonable. Instead, the *Gillig* Court stated: "[t]he simple question in this case is, therefore, whether the alleged intention of the defendants to build a dwelling or dwellings upon the lot which he sought to purchase is such a statement of an existing material fact as authorizes the court to cancel the deed because of the fraud." *Gillig*, 199

***

In sum, the Court concludes, based on the undisputed facts and drawing all reasonable inferences in favor of plaintiffs, that no rational trier of fact could find that plaintiffs reasonably relied on any alleged misstatement by defendants. Accordingly, defendants' motion for summary judgment with respect to plaintiffs' claims of fraudulent inducement is granted.

## 2. Unjust Enrichment

Defendants are also entitled to summary judgment on plaintiffs' unjust enrichment claims. A plaintiff may only assert an unjust enrichment claim in the absence of an agreement between the parties, be it oral, written, or implied-in-fact. *See, e.g.*, *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*, 448 F.3d 573, 586-87 (2d Cir. 2006) (citing *Goldman v. Metro Life. Ins. Co.*, 841 N.E.2d 742 (N.Y. 2005)). "In order to recover in quantum meruit under New York law, a claimant must establish '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host*

---

N.Y. at 319. The question before the Court on the instant motion for summary judgment is, based on the undisputed facts, whether plaintiffs could reasonably have relied on the alleged statement. As discussed above, plaintiffs had reason to doubt defendants' statements and, therefore, could not reasonably rely on them as an inducement to form a contract. Therefore, those statements cannot serve as the basis for a claim of fraudulent inducement.

*Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000) (citation and internal quotation marks omitted)); *see also Beth Israel*, 448 F.3d at 586. "It is impermissible . . . to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987).

In this case, it is undisputed that there was a written agreement governing both the sale of the Residence and the assignment of that contract to Villa Pointe LLC. Plaintiffs argue that they were induced to enter those contracts by fraud and that the contracts are, therefore, invalid. However, as discussed above, the Court concludes that, on the undisputed facts, no rational jury could find that plaintiffs were fraudulently induced to enter those contracts. Therefore, plaintiffs' unjust enrichment claims must fail because the scope of the parties' dealings was clearly governed by the valid written contracts. *See, e.g.*, *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1272 (S.D.N.Y. 1991) ("[I]f the fraud allegations are dismissed or determined to be without merit, then unjust enrichment is not a valid theory of recovery." (citing *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976 (S.D.N.Y. 1989)); *Hartford Fire Ins.*, 723 F. Supp. at 994 ("Where, as here, there is an express contract governing the subject matter that was not breached, there can be no unjust enrichment." (collecting cases)). Accordingly, defendants' motion for summary judgment on plaintiffs' unjust enrichment

claims is granted.[43]

## V. CROSS-MOTIONS FOR SANCTIONS

The Court has carefully considered the parties' cross-motions for sanctions and concludes that neither motion has merit. In considering a motion for sanctions under Rule 11 of the Federal Rules of Civil Procedure, this Court applies a standard of "objective reasonableness." *See MacDraw, Inc. v. CIT Group Equip. Fin., Inc.*, 73 F.3d 1253 1257-58 (2d Cir. 1996). Additionally, when "divining the point at which an argument turns from merely losing to losing and sanctionable, . . . courts [must] resolve all doubts in favor of the signer" of the pleading. *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993) (internal quotation marks omitted).

Defendants argue that sanctions are warranted against plaintiffs under Rule 11 of the Federal Rules of Civil Procedure because discovery in this action has revealed that all of plaintiffs' claims are frivolous.[44] Defendants also argue that plaintiffs should be sanctioned for maintaining this action against the

---

[43] To the extent plaintiffs argue that their unjust enrichment theory applies to the damages on their fraud claims, the Court need not address that argument because plaintiffs cannot show liability. Similarly, because plaintiffs cannot prove liability on any of their claims, the Court need not address the question of punitive damages.

[44] Defendants also argue that plaintiffs should be sanctioned for continuing to assert a claim for breach of contract that was already dismissed by this Court. Although plaintiffs did include their breach of contract claim in their second amended complaint, even after such claim had been dismissed, plaintiffs clarified in their July 7, 2009 letter that they no longer assert a breach of contract claim.

Nicotras until defendants filed their motion for summary judgment. Although defendants are entitled to summary judgment on all of plaintiffs' claims, the Court concludes, in its discretion, that plaintiffs' claims are not frivolous or objectively unreasonable. Plaintiffs' claims survived a motion to dismiss based largely on the precedent of *Adams v. Gillig*, 199 N.Y. 314 (1910). Although the undisputed facts revealed that there was no reasonable reliance by plaintiffs on the alleged misstatements as a matter of law, there was nothing about the pursuit of these claims by plaintiffs that would support the imposition of sanctions.[45] *See Motown Prod., Inc. v. Cacomm, Inc.*, 849 F.2d 781, 785 (2d Cir. 1988) ("While it is true that certain facts revealed during discovery weakened [defendant's] position, those facts did not require [defendant's counsel] to withdraw the counterclaims. . . . [Defendant] acknowledged the facts and argued its position as zealously as possible.") (reversing imposition of Rule 11 sanctions). Accordingly, defendants' motion for sanctions is denied.[46]

Plaintiffs argue that sanctions are warranted against defendants because defendants make improper arguments or misstatements of fact in their summary judgment papers. As a threshold matter, plaintiffs' motion is procedurally deficient because plaintiffs did not afford defendants the requisite 21-day safe harbor under Rule 11. (*See* Pls.' Sanctions Reply Br. at 5.) Therefore, the motion must be denied. *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1328 (2d Cir. 1995) (holding a district court's imposition of sanctions to be an abuse of discretion where the party seeking sanctions did not provide the opposing party with 21-day "safe harbor" to correct his misstatements before filing Rule 11 motion). In any event, even if the Court could review plaintiffs' motion for sanctions on the merits, the Court concludes that none of defendants' allegedly improper arguments or misstatements are objectively unreasonable, and any misstatements of fact are trivial. *See S.E.C. v. Shainberg*, 316 F. App'x 1, 2 (2d Cir. 2008). Accordingly, plaintiffs' motion for sanctions is denied.

## III. CONCLUSION

For the reasons set forth above, the Court concludes that subject matter jurisdiction in this case is proper. Plaintiffs' appeal of Magistrate Judge Wall's May 7, 2009

---

[45] Similarly, plaintiffs' claims against the Nicotras were adequately pled in the second amended complaint. The fact that discovery may have revealed that plaintiffs did not have a claim against the Nicotras does not provide a basis for sanctions.

[46] In defendants' reply in support of their sanctions motion, they point to several arguably threatening comments by plaintiff Michael Fierro in a May 3, 2009 letter to defendants. (*See* Defs.' Sanctions Reply Decl., Ex. A.) For instance, Fierro stated: "The Galluccis have to pay out the majority of the money anyway, either to us, to the other Defendants or to the IRS, so they might as well do it as part of a settlement and avoid some potentially nasty adverse consequences." (*Id.* at 2.) Fierro further stated: "All things considered (the economics, the negative consequences of a fraud conviction, tax evasion, losing SEC

licensing, etc.), your clients are crazy not to accept." (*Id.*) Although the Court does not approve of comments that threaten criminal sanctions to induce a settlement, the Court concludes that these comments do not provide a sufficient basis for sanctions under the circumstances of this case. *See generally Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71 (2d Cir. 2000) (finding that variety of allegedly inappropriate or threatening statements were not grounds, in that case, for sanctions).

discovery ruling is denied. The Court also concludes, based on the undisputed evidence, that defendants are entitled to summary judgment on plaintiffs' fraud claims because no rational trier of fact could find that plaintiffs reasonably relied on any alleged misstatement by defendants. Defendants are also entitled to summary judgment on plaintiffs' unjust enrichment claims. Accordingly, defendants' motion for summary judgment is granted in its entirety. The parties' cross-motions for sanctions are denied. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 24, 2010
Central Islip, New York


* * *

Plaintiffs are proceeding *pro se*. The attorney for defendants is J. Edward Gathman Jr., Esq., of Gathman & Bennett LLP, 191 New York Avenue, 2nd Floor, Huntington, NY 11743.